# In the Iowa Supreme Court

No. 25–0575

Submitted February 19, 2026—Filed June 26, 2026

**State of Iowa,**

Appellee,

vs.

**Eric Martin Schadl,**

Appellant.

Appeal from the Iowa District Court for Dubuque County, Thomas A. Bitter (motion to dismiss and motion to expand) and Michael J. Shubatt (judgment and sentence), judges.

The defendant challenges his conviction for being a convicted domestic abuser in possession of a firearm as violating his right to keep and bear arms under both the Iowa and Federal Constitutions. **Reversed and Case Remanded for Dismissal.**

McDermott, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, Mansfield, and May, JJ., joined. Mansfield, J., filed a concurring opinion, in which Waterman, J., joined. Waterman, J., filed a concurring opinion. McDonald, J., filed a dissenting opinion, in which Oxley, J., joined.

Martha J. Lucey, State Appellate Defender; Theresa R. Wilson, Assistant Appellate Defender; and Kyle Kopf (argued) (until withdrawal), law student, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven (argued), Assistant Attorney General, for appellee.

W. Charles Smithson, West Des Moines, for amicus curiae Twenty-Nine Iowa State Senators.

**McDermott, Justice.**

In this case, we consider whether the State's lifetime ban on misdemeanor domestic abusers from possessing firearms may violate an individual's fundamental right to keep and bear arms under the Iowa Constitution.

I.

In July 2024, police received a report that a man prohibited from possessing firearms nonetheless had them in his home. When an officer went to investigate, Eric Schadl admitted that he had a .22 caliber rifle in the home. Schadl also admitted that he had a prior domestic abuse assault conviction and was thus prohibited from possessing firearms. Records showed that almost fourteen years earlier, in November 2010, Schadl had been convicted of domestic abuse assault causing injury, a misdemeanor. The State charged Schadl with violating Iowa Code § 724.26(2)(*a*) (2024), which states that a person "who has been convicted of a misdemeanor crime of domestic violence under 18 U.S.C. § 922(g)(9) and who knowingly possesses . . . a firearm, offensive weapon, or ammunition is guilty of a class 'D' felony."

Schadl filed a motion to dismiss the charge, arguing that the State's effort to enforce the firearm prohibition in the statute was unconstitutional under both article I, section 1A of the Iowa Constitution (Amendment 1A) and the Second Amendment to the United States Constitution. The State resisted the motion in a one-page filing. The district court denied the motion, concluding that the prohibition survived under an intermediate scrutiny standard.

Schadl then filed a motion to expand the district court's findings and conclusions. He argued that the intermediate scrutiny standard had been supplanted by Amendment 1A, which imposed a strict scrutiny standard, and by a revised test under the Second Amendment, as articulated by the United

States Supreme Court in various cases including *United States v. Rahimi*, 602 U.S. 680, 698–700 (2024). Schadl urged the district court to reconsider its decision under the proper constitutional tests. The State did not file any response. The district court issued an order that again upheld the statute's constitutionality, concluding:

> There is a compelling governmental interest in disarming dangerous and violent people and keeping society safe. The statute, as applied to the Defendant, is valid and enforceable. Even applying strict-scrutiny, the Defendant's motion fails.

Schadl thereafter entered a written conditional guilty plea admitting that he possessed a firearm and that he had previously been convicted of domestic abuse assault, but he reserved the right to appeal the district court's denial of the motion to dismiss. The district court sentenced Schadl to five years in prison and a $1,025 fine, but then suspended the sentence and placed him on probation. Schadl appeals.

## II.

We begin with Schadl's challenge to § 724.26(2)(*a*) under the Iowa Constitution. He argues that his conviction, which is based on the firearm restriction for his misdemeanor domestic assault conviction in 2010, violates his rights under Amendment 1A. In 2022, Iowa voters ratified Amendment 1A, which recognizes a fundamental right to keep and bear arms:

> The right of the people to keep and bear arms shall not be infringed. The sovereign state of Iowa affirms and recognizes this right to be a fundamental individual right. Any and all restrictions of this right shall be subject to strict scrutiny.

Iowa Const. art. I, § 1A.

Constitutional challenges to statutes are of two types: facial and as-applied. A facial challenge is the most difficult to prove. It asserts that a statute is unconstitutional in *all* its applications, meaning that there's no set of

facts under which the law could be validly enforced. *Honomichl v. Valley View Swine, LLC*, 914 N.W.2d 223, 231 (Iowa 2018), *overruled on other grounds by Garrison v. New Fashion Pork LLP*, 977 N.W.2d 67 (Iowa 2022). If there is even a single circumstance where the law could be applied constitutionally, the facial challenge fails. *Summit Carbon Sols., LLC v. Kasischke*, 14 N.W.3d 119, 126 (Iowa 2024). In contrast, an as-applied challenge asserts that a statute is unconstitutional as it relates to a specific set of facts. *Singer v. City of Orange City*, 15 N.W.3d 70, 76 (Iowa 2024). This analysis is highly fact-specific, with the court considering whether the statute's application to someone in their particular circumstances violates a constitutional right. *Honomichl*, 914 N.W.2d at 231. Schadl raises both challenges here.

Schadl's facial challenge argument is directed more at his Second Amendment claim than his Amendment 1A claim. His facial challenge under Amendment 1A immediately confronts headwinds, as it's not hard to conceive of situations in which the state would be justified in the continued disarmament of someone convicted under the statute. Suppose, for instance, that a defendant is barred from possessing a firearm under § 724.26(2)(*a*) based on a conviction for domestic abuse assault that occurred *one week prior*. Such a conviction would be evidence of the defendant's very recent dangerous assaultive conduct toward a domestic partner, and the defendant could face up to a two-year sentence. *See* Iowa Code § 903.1(2) (establishing the maximum term of incarceration for aggravated misdemeanor convictions). We certainly could not say that restricting access to firearms for a person one week after an assault would in every case be an unconstitutional application of the statute. Because a single lawful application of the statute is enough to vanquish a facial challenge, *Doss v. State*,

961 N.W.2d 701, 716 (Iowa 2021), Schadl's facial challenge under Amendment 1A fails.

His as-applied challenge presents a much different analysis. Schadl argues that the indefinite firearm ban imposed under the statute cannot withstand strict scrutiny when considering the age of his conviction and the lengthy period he has gone without reoffending. Although Amendment 1A might be new, the application of strict scrutiny is not. The concept is well established, both at the federal and state level, as an analytical tool in addressing challenges involving fundamental rights. *See, e.g., S.A. Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16–17 (1973); *State v. Hartog*, 440 N.W.2d 852, 854 (Iowa 1989). It is the most exacting standard of constitutional review, placing "all the burden of justification on the State." *Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, 975 N.W.2d 710, 731 (Iowa 2022).

Strict scrutiny requires the government to show that the challenged action is "narrowly tailored" to achieve "a compelling state interest," and it further requires the government to use "the least restrictive means" in doing so. *Mitchell County v. Zimmerman*, 810 N.W.2d 1, 16 (Iowa 2012) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)). The State asserts, and Schadl concedes, that the state has a compelling interest in protecting the public from gun violence by people convicted of domestic abuse. The questions at the heart of this appeal center on (1) which party bears the burden under strict scrutiny and (2) whether the statute's indefinite duration is narrowly tailored to the state's interest in public safety as applied to Schadl.

The parties dispute who bears the burden under the strict scrutiny standard. In the district court, in response to Schadl's motion to dismiss, the State filed a one-page response with four numbered paragraphs. The first

paragraph simply recited the charge. The second paragraph noted that the minutes of testimony explained that Schadl "has a prior conviction and that he was in possession of a firearm," and that if proved, he would be guilty of the offense. The third paragraph cites two cases for the proposition that "[s]tatutes are cloaked with a strong presumption of constitutionality," a challenger "carries a heavy burden of rebutting this presumption," and the challenger "must negate every reasonable basis upon which the statute could be upheld as constitutional." (Quoting *Glowacki v. State of Iowa Bd. of Med. Exam'rs*, 501 N.W.2d 539, 541 (Iowa 1993).) The fourth and final paragraph stated: "The defendant has not provided enough facts to show that the statute is not constitutional on its face and applied to this defendant." The State filed nothing further on the motion to dismiss, and it filed no response to Schadl's motion to expand.

Although its response asserted that Schadl bore the burden of establishing the statute's unconstitutionality, the State never mentioned strict scrutiny as the applicable standard. And likewise, neither of the two cases the State cited in its response mentioned or applied strict scrutiny. The State's response closed by faulting Schadl for offering insufficient facts to establish the statute's unconstitutionality.

On appeal, the State acknowledges "that strict scrutiny ordinarily requires *the government* to prove that a measure is narrowly tailored to serve compelling state interests." But the State argues that the burden here nonetheless resides with Schadl. The State cites two cases supporting its proposition. The first, *G.Y. v. S.W.* (*In re Guardianship of L.Y.*), addresses the burden of proof in a guardianship termination proceeding, not a constitutional challenge to a statute. 968 N.W.2d 882, 898 (Iowa 2022). The only mention of strict scrutiny refers to

our application of it in a different case that did involve a constitutional challenge but to a completely different law. *Id.* The second case, *State v. Cole*, merely recites that statutes are presumed constitutional and that the challenger bears the heavy burden of rebutting that presumption. 23 N.W.3d 231, 236 (Iowa 2025). But *Cole* does not connect this statement to any strict scrutiny analysis; indeed, *Cole* contains no application of strict scrutiny whatsoever. *See id.* Instead, we have said that the presumption works in the opposite direction in strict scrutiny cases: "Under strict scrutiny, a law is presumptively invalid, and the burden is on the government . . . ." *Planned Parenthood of the Heartland, Inc. v. Reynolds*, 962 N.W.2d 37, 47–48 (Iowa 2021) (emphasis added).

Amendment 1A's requirement to apply strict scrutiny imposes a duty on our court to apply *actual* strict scrutiny, not some hollow version of it. This is critical both because courts have a duty to honor the will of the people in demanding strict scrutiny for firearms restrictions (expressed through successive legislative majorities and voters' own ballots) and because our application of strict scrutiny today reaches beyond the immediate case. Strict scrutiny as a constitutional test performs a vital adjudicative function. Our application of it in challenges brought under Amendment 1A must not deviate from how we apply the standard in other contexts. To do otherwise "threaten[s] to degrade the meaning of strict scrutiny and thereby blunt that standard of review's ability to serve its historic purposes when deployed in other contexts." Todd E. Pettys, *The N.R.A.'s Strict-Scrutiny Amendments*, 104 Iowa L. Rev. 1455, 1481 (2019). ("[I]f a court waters down strict scrutiny's requirements in one setting, it thus threatens to water down those requirements in all of the other settings in which that standard applies.").

The State, not the defendant, bears the burden to show that the statute's indefinite prohibition here "serves a compelling state interest and is the least restrictive means of attaining that interest." *Mitchell County*, 810 N.W.2d at 16; *see also Sanchez v. State*, 692 N.W.2d 812, 817 (Iowa 2005) (stating that when a statute "is subjected to strict scrutiny review," "[t]he State must prove it is narrowly tailored to the achievement of a compelling state interest"); *In re C.M.*, 652 N.W.2d 204, 210 (Iowa 2002) ("If strict scrutiny were mandated, then the State would have the burden to show the classification was narrowly tailored to serve a compelling governmental interest."). The State failed to recognize its burden in the district court, and thus likewise failed to present any facts to meet its burden.

The State attempts to fill this void on appeal by citing research papers that it contends show heightened recidivism rates for domestic abusers. *See, e.g.*, Beth M. Costa et al., *Longitudinal Predictors of Domestic Violence Perpetration and Victimization: A Systematic Review*, 24 Aggression & Violent Behav. 261 (2015); Amy Karan & Helen Stampalia, *Domestic Violence and Firearms: A Deadly Combination*, 79 Fla. Bar J. 79 (2005); Aaron B. Shev et al., *Importance of Categories of Crime for Predicting Future Violent Crime Among Handgun Purchasers in California*, 10:57 Inj. Epidemiology 1 (2023); Garen J. Wintemute et al., *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns*, 280 JAMA 2083 (1998). The statistics reflected in these research papers, the State argues, support the lifetime imposition of a firearm ban on domestic abusers to preserve public safety.

In citing these research papers, the State relies on "legislative facts," which refer to "facts that bear on the justification for legislation," as opposed to

"adjudicative facts," which refer to "facts concerning the conduct of parties in a particular case." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (Posner, J.) (citing Fed. R. Evid. 201(a) advisory committee's note to 1972 amendment). Although we have no formalized set of rules for considering legislative facts, *Varnum v. Brien*, 763 N.W.2d 862, 881 (Iowa 2009), we must tread cautiously when asked to rely on studies that appear for the first time in an appellate brief without having first been presented to or considered by the district court. No expert in this case has testified that any specific study is reliable or authoritative, and no party has had a chance to question a witness about potential flaws in the data or methodology.

The risks in relying too heavily on the studies the State cites is particularly notable here, as our research uncovered multiple studies that directly challenge the conclusions presented by the State. For instance, a ten-year study of domestic abusers in Massachusetts found that the majority of those who recidivated did so within the first year. Andrew R. Klein & Terri Tobin, *A Longitudinal Study of Arrested Batterers, 1995-2005: Career Criminals*, 14 Violence Against Women 136, 144–46 (2008). According to the study's authors, the number of abusers who were rearrested "markedly declined" after the first two years following their initial arrest. *Id.* at 145. Similarly, a thirty-month evaluation of court-referred abusers showed that new offenses "progressively decreased over time," with 83% of reoffenses occurring within the first fifteen months and only 17% occurring in the final fifteen months. Edward W. Gondolf, *A 30-Month Follow-up of Court-Referred Batterers in Four Cities*, 44 Int'l J. Offender Therapy & Compar. Criminology 111, 120–21 (2000). Many of the reoffenses occurred early in the fifteen-month period, with 37% taking place within three months and 61% taking place within six months. *Id.* at 121. Another

study of 1,628 convicted abusers in Spain over fifteen years largely echoed these results, finding that 60% of total recidivism occurred within the first five years and 92% occurred within the first ten. Alba Verdugo-Martínez, Román Ronzón-Tirado & Natalia Redondo-Rodríguez, *Personality Traits and Their Role in Intimate Partner Violence Recidivism: A 15-Year Follow-Up Study Within a Prison Sample*, 235 Personality & Individual Differences 1, 2–3 (2025).

This group of studies indicates that the risk of recidivism decreases considerably the longer a person goes without reoffending. We read the studies cited by the State to be in general agreement on this point, although with recidivism decreasing at a slower rate in the State's studies. Most pertinent to Schadl's as-applied challenge here, research shows that recidivism rates for domestic abusers not only decline steadily as time passes, but decline dramatically near the fifteen-year mark. In short, the State's legislative facts fail to convince us that the firearm prohibition as applied to Schadl—who had gone fourteen years without reoffending—was narrowly tailored to advance public safety.

A law is not narrowly tailored if it is "seriously overinclusive" or "seriously underinclusive." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 805 (2011). Schadl's tailoring argument is essentially one of overinclusion, as § 724.26(2)(*a*) lumped him together with all other convicted abusers in barring possession of firearms despite his fourteen years without reoffending. We know little else about Schadl on the record presented. The facts of his 2010 offense conduct are not in the record. There's no evidence, for instance, that he brandished or used a weapon in the offense. If the State possessed information that Schadl was a continued public danger after fourteen years without reoffending, the State could have attempted to offer it; it didn't. Beyond the mere fact of his misdemeanor

conviction in 2010, the State presented nothing in the district court to establish Schadl as an ongoing public safety threat.

This is a significant problem for the State, because in an as-applied challenge, showing that a statute offers the least restrictive means to achieve its aim is no easy task. Consider *Mitchell County v. Zimmerman.* 810 N.W.2d 1. In that case, the plaintiff challenged a county ordinance that banned driving vehicles with wheels having steel cleats on paved roadways. *Id.* at 4. A member of the Old Order Groffdale Conference Mennonite Church, which forbids members from driving tractors without steel cleats, challenged the ordinance as a violation of his constitutional right to free exercise of his religion. *Id.* The county argued that the ordinance was necessary to protect hard-surfaced roads. *Id.* at 5. We held that the county failed to establish that the ordinance was narrowly tailored to achieve the stated objective of road preservation because, among other reasons, "[a] more narrowly-tailored alternative" to the county's ordinance "might allow steel wheels on county roads in some circumstances, while establishing an effective mechanism for recouping the costs of any necessary road repairs if damage occurs." *Id.* at 17.

Here, less restrictive means of ensuring public safety are readily identifiable. Rather than imposing the indefinite firearm ban in § 724.26(2)(*a*), the statute could limit the prohibition to a specified duration for those who remain law-abiding for an extended period, recognizing that recidivism rates for these offenders appear to decline over time. Alternatively, the statute could allow convicted offenders to demonstrate their fitness for reinstatement after a certain period, mirroring the process in Iowa Code § 724.31. That statute allows people disqualified from possessing firearms for mental health reasons to petition the court for restoration of firearm rights, provided they can prove that they are not

likely to act in a manner dangerous to public safety and that the restoration would not be contrary to the public interest. *Id.*; *see also In re N.S.,* 13 N.W.3d 811, 821–22 (Iowa 2024).

The State correctly points out that narrow tailoring does not require perfect tailoring. But this statute provides *no tailoring.* All offenders face the same indefinite ban—regardless of their propensity to recidivate or any actual effect their continued disarmament might have on public safety. The State had to offer more than merely a rational basis to justify such a sweeping ban in the name of public safety. It has failed to meet its burden to show the statute's narrow tailoring under strict scrutiny.

The State includes an argument that the legislature, "in twice approving the amendment before submitting it to the people for a referendum, did not intend the amendment to overturn the numerous laws on the books." (Quoting *State v. Woods,* 23 N.W.3d 258, 275 (Iowa 2025) (plurality opinion), *petition for cert. filed,* No. 25–5746 (U.S. Sep. 26, 2025).) But among other problems, such an argument only considers one party to the amendment process. The record contains no evidence of voters' knowledge about existing firearm restrictions when they voted for Amendment 1A, let alone what knowledge they might have had about the indefinite prohibition in § 724.26(2)(*a*) specifically. On the contrary, it may be just as conceivable that voters ratifying Amendment 1A preferred instead to do away with all existing restrictions that violated the new amendment without a laborious statute-by-statute repeal. In this way, voters might have concluded that it was better to address existing restrictions through a single constitutional amendment. Regardless, we should not embrace the notion that every existing firearm restriction passes strict scrutiny based on speculation that voters knew about and endorsed every such restriction in the

Iowa Code's eight volumes. In any case, voters' understanding of existing statutes simply can't be substituted for the strict scrutiny analysis that Amendment 1A requires us to engage in.

The dissent, for its part, presents an argument that the State never raised, but its argument is harder to pin down, partly because at points it veers in two incompatible directions. On the one hand, it asserts that firearm restrictions existing in 2022 automatically survive an Amendment 1A challenge because we must look to the laws in place at ratification. On the other hand, it concedes that "[o]f course, this is not to say that every law related to firearms in the Code as of 2022 will survive constitutional challenge."

Under the dissent's first (and primary) argument, Amendment 1A applies only to hypothetical *future* firearm restrictions and deems any restriction existing in 2022 presumptively constitutional. But this argument is irreconcilable with the text of Amendment 1A itself, which explicitly requires us to apply strict scrutiny to "[*a*]*ny and all* restrictions of this right." Iowa Const. art. I, § 1A (emphasis added). If the legislature and voters ratifying Amendment 1A really intended to exempt all existing firearm laws, they could hardly have chosen more contradictory language. As we have said, "the text of the constitution is at the core of our analysis and is our primary focus." *State v. Green*, 896 N.W.2d 770, 778 (Iowa 2017). We read "[a]ny and all restrictions" to mean exactly what it says, and we thus reject the dissent's attempt to constrict the scope of the constitutional right. Iowa Const. art. I, § 1A.

Under the dissent's second argument—that some 2022 laws will fail a constitutional challenge—it offers no standard for deciding which restrictions pass or fail, other than circular reasoning that reverts right back to blessing any law in effect in 2022.

The dissent mischaracterizes our holding in suggesting that we believe the legislature either misunderstood Amendment 1A or lacked the conviction to repeal conflicting laws on its own. Neither is true. The legislature's considered decision to label the right "fundamental" and to explicitly subject restrictions to "strict scrutiny" serves as an unmistakable clarion call to the judiciary. Iowa Const. art. I, § 1A; *see also State v. Groves*, 742 N.W.2d 90, 93 (Iowa 2007) (requiring strict scrutiny when a government action implicates a "fundamental" right). The strict scrutiny standard is a wholly judicial construct developed by courts, for courts, as a tool to "determine whether the government action infringing the fundamental right is narrowly tailored to serve a compelling government interest." *State v. Hernandez-Lopez*, 639 N.W.2d 226, 238 (Iowa 2002). No other provision in our constitution expressly defines a right as fundamental or explicitly demands strict scrutiny, as Amendment 1A does, and no other branch, including the legislature, applies a strict scrutiny test. The legislature and the people deliberately enshrined this standard—expressed in the very language courts themselves created—as a judicial check on the state's power to restrict the right to keep and bear arms. Behind the dissent's pretense of judicial humility lies a failure to abide Amendment 1A's text and perform the constitutional duty demanded of us. "[W]hen the government crosses the line from permissible regulation into unconstitutional infringement, courts have a duty to say so in the cases before them . . . ." *United States v. Hemani*, 608 U.S. ___, ___, 2026 WL 1751710, at *4 (June 18, 2026).

In missing this point, the dissent stumbles to the erroneous view that finding a restriction unconstitutional equates to an accusation of legislative bad faith. On the contrary, it is simply a legal determination that the State failed to prove the constitutional tailoring required to justify the restriction. Indeed, as

explained, we hold that Iowa Code § 724.26(2)(*a*) is facially *constitutional*. The statute violates Amendment 1A as applied to the facts of this case, based on the evidence—or, perhaps more accurately, lack of evidence—presented by the State.

In a footnote, the dissent also suggests that a focus on "dangerousness" in our Amendment 1A analysis is misguided. But that focus simply flows from the strict scrutiny test itself, which requires the infringing restriction to be narrowly tailored to a compelling government interest. Here, the State identifies public safety—and thus Schadl's danger to others—as its compelling interest. The dissent's footnote will certainly surprise the State, given that the State's brief focused almost entirely on dangerousness to defend against the Amendment 1A challenge here.

The State also raises a separate argument that the statute survives strict scrutiny because Schadl has a path to have his firearm rights reinstated through a pardon from the Governor. The constitution authorizes the Governor "to grant reprieves, commutations and pardons, after conviction, for all offences except treason and cases of impeachment, subject to such regulations as may be provided by law." Iowa Const. art. IV, § 16. The State notes that a pardon would render the prohibition in § 724.26(2)(*a*) inoperable, and that pardons are granted in about 20–25% of applications reviewed. The availability of pardons, the State argues, shows "that section 724.26(2)(a) is more narrowly tailored to one-time offenders who *still* present some danger."

We are unconvinced. The Governor's pardon power is completely discretionary; nothing in the constitution mandates a pardon to an offender, no matter how worthy, under any circumstances. The potential availability of a pardon doesn't implicate a constitutional or inherent right. *See Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464, 467 (1981); *Greenholtz v. Inmates of*

*the Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). There's similarly no right for an applicant to seek review of the Governor's denial of a pardon. *See* Iowa Code § 914.4. In our view, the chance at a pardon is inadequate, as a restoration right, to satisfy the State's narrow tailoring requirement under strict scrutiny.

Because we hold that Schadl's conviction must be vacated and remanded for dismissal based on his as-applied challenge under Amendment 1A, we need not reach his challenge under the Second Amendment.

III.

Like all as-applied challenges, this case turns on the specific circumstances of the defendant before us. The State has failed to establish that the indefinite firearm prohibition imposed against Schadl—based solely on his misdemeanor domestic abuse assault conviction in 2010—is the least restrictive means of achieving its interest in public safety under strict scrutiny. As a result, we vacate his conviction and remand to the district court for dismissal.

**Reversed and Case Remanded for Dismissal.**

Christensen, C.J., and Waterman, Mansfield, and May, JJ., join this opinion. Mansfield, J., files a concurring opinion, in which Waterman, J., joins. Waterman, J., files a concurring opinion. McDonald, J., files a dissenting opinion, in which Oxley, J., joins.

**Waterman, Justice (concurring).**

I join the court's majority opinion as well as Justice Mansfield's concurrence. I write separately to respond to the dissent. Specifically, the dissent makes three interrelated categorical errors in its interpretation of article I, section 1A of the Iowa Constitution (Amendment 1A). First, the dissent effectively interprets "the people" within the meaning of Amendment 1A to include only "law-abiding citizens." Second, the dissent concludes that firearm statutes on the books in 2022 (when Amendment 1A was enacted) are beyond the reach of its constitutional protection. Third, the dissent misinterprets Amendment 1A by claiming that Iowa courts can avoid their constitutional mandate to apply strict scrutiny simply by declaring that "the nature and scope of the state constitutional right to keep and bear arms does not extend to convicted domestic abusers" or any other defendant accused of violating a state firearm statute that was in effect in 2022. The dissent's approach would nullify Amendment 1A's strict scrutiny requirement. The dissent's interpretation was not urged by the State or its amicus; to the contrary, both the State and its amicus acknowledge that strict scrutiny is required.

The dissent's interpretation is at odds with the plain meaning of the text of Amendment 1A, which provides:

> The right of *the people* to keep and bear arms shall not be infringed. The sovereign state of Iowa affirms and recognizes this right to be a fundamental individual right. *Any and all restrictions* of this right shall be subject *to strict scrutiny*.

*Id.* (emphasis added).

In my view, the term "the people" in Amendment 1A includes all Iowans, not just those with no criminal record. Eric Schadl, therefore, is among "the

people" within the protection of Amendment 1A, notwithstanding his misdemeanor conviction fourteen years ago. And Amendment 1A's reference to "[a]ny and all restrictions of this right," *id.*, necessarily includes Iowa Code section 724.26(2)(*a*) (2024). That statute makes it a crime for Schadl to possess a firearm; it isn't beyond the reach of Amendment 1A merely because it was already on the books in 2022.

The dissent would effectively rewrite Amendment 1A to state:

> The right of *law-abiding citizens* to keep and bear arms shall not be infringed. The sovereign state of Iowa affirms and recognizes this right to be a fundamental individual right. Any and all *newly enacted* restrictions of this right shall be subject to strict scrutiny, *but not restrictions in place in 2022*.

It is not our court's role to rewrite Amendment 1A to evade its strict scrutiny requirement.

I agree with the dissent that we are to construe "Amendment 1A as publicly understood at the time of its enactment in 2022." (Quoting *In re N.S.*, 13 N.W.3d 811, 826 (Iowa 2024) (plurality opinion).) Amendment 1A was not enacted in a vacuum; context matters and demonstrates the salience of the strict scrutiny requirement. As we observed in *In re N.S.*,

> The impetus for Amendment 1A was a campaign by the National Rifle Association (NRA) proposing state constitutional amendments to strengthen firearm rights. Todd E. Pettys, *The N.R.A.'s Strict-Scrutiny Amendments*, 104 Iowa L. Rev. [1455,] 1455–56 (2019) [hereinafter Pettys]. "The N.R.A.'s amendment campaign focuses on adopting the word 'fundamental' to describe the right to keep and bear arms and on requiring strict scrutiny for any governmental restraints placed upon that right." *Id.* at 1465. Iowa is the fourth state after Alabama, Louisiana, and Missouri, to adopt the NRA-model strict-scrutiny amendment. "[L]awmakers had simply feared that the Court's 5–4 rulings in [*District of Columbia v.*] *Heller*[, 554 U.S. 570, 635 (2008),] and *McDonald* [*v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion),] 'might later be threatened by a change in the composition of the Supreme Court.'" Pettys, 104 Iowa L. Rev. at 1473 & n.108 (quoting *State v. Draughter*, 130 So. 3d 855,

861 n.6 (La. 2013)); *see also Dotson v. Kander*, 464 S.W.3d 190, 201–02 (Mo. 2015) (en banc) (per curiam) (Fischer, J., concurring) (noting proponents of the Missouri amendment "wanted to make sure that our state constitutional protection of the right to bear arms remains at least as protective as *Heller* and *McDonald*" given the "mere 5–4 majority" in those cases).

*In re N.S.*, 13 N.W.3d at 826–27 (second, third, and sixth alterations in original) (footnotes omitted). This backdrop reinforces the importance of the strict scrutiny requirement.

The dissent argues that courts can avoid applying strict scrutiny simply by defining the "scope of the state constitutional right to keep and bear arms" to omit any protection for alleged violations of firearm statutes already on the books at the time of Amendment 1A's enactment. The majority opinion correctly rejects the dissent's interpretation. The dissent's interpretation has not been adopted by any appellate court in the other states that have adopted the NRA amendment. Not surprisingly, those courts apply strict scrutiny to challenged firearm restrictions, just as the plain text of these amendments requires. For example, the Louisiana Supreme Court explained:

> [T]he voters' ratification of strict scrutiny as a standard of review to be applied to alleged infringements on the right to keep and bear arms was not meant to invalidate every restriction on firearms, whether in existence at the time the amendment was ratified or yet to be enacted. Rather, the strict scrutiny standard adopted by the voters is "designed to provide a framework for carefully examining the importance and sincerity of the reasons advanced by the governmental decisionmaker" for firearm regulation within the context of the fundamental right to keep and bear arms.

*State v. Eberhardt*, 145 So. 3d 377, 383–84 (La. 2014) (quoting *State in re J.M.*, 144 So. 3d 853, 860 (La. 2014)). The Missouri Supreme Court likewise applies strict scrutiny as required by that state's constitutional amendment. *See State v. Clay*, 481 S.W.3d 531, 538 (Mo. 2016) (en banc) ("Similarly, here, Amendment 5 did not bar the General Assembly from adopting laws regulating possession of

firearms by nonviolent felons. It does state that such laws are subject to strict scrutiny. 'That strict scrutiny applies "says nothing about the ultimate validity of any particular law; that determination is the job of the court applying" the standard.' " (quoting *Dotson*, 464 S.W.3d at 197)).

Our court, too, has applied strict scrutiny as required by Amendment 1A, beginning with *In re N.S.*, 13 N.W.3d at 828–29; *id.* at 838 (McDermott, J., dissenting, joined by Mansfield and May, JJ.), more recently in *State v. Mahana*, ___ N.W.3d ___, ___, 2026 WL 1699725, at *11 (Iowa June 12, 2026) ("Our state constitution mandates that strict scrutiny be applied to '[a]ny and all restrictions' on '[t]he right of the people to keep and bear arms.' " (alterations in original) (quoting Iowa Const. art. I, § 1A)), and again in today's opinion.

The dissent relies on our observation that the same legislators who approved Amendment 1A failed to repeal firearm restrictions challenged under that amendment. *See In re N.S.*, 13 N.W.3d at 835. Properly understood, the fact that the challenged law was already on the books when Amendment 1A was enacted goes to the state's interest in enforcing the law under the strict scrutiny analysis, with the court to determine whether the government's interest is compelling and whether the challenged law is narrowly tailored. *See id.* at 830–35 (applying strict scrutiny). Indeed, legislators acknowledged in the floor debates that Amendment 1A could strike down some existing statutory firearm restrictions, as determined by the courts case by case.[1]

---

[1]For example, Senator Zach Whiting said during the floor debate in 2021:

That's for the courts to decide. That's what a case in controversy is. If I walked across the street right now and asked the Chief Justice of the Supreme Court of the State of Iowa, would this law be unconstitutional if its challenged under the standard of review? She'd laugh me out the door and say, "Well, Senator, I can't answer that because there is not a case or controversy before me." So, what we have to do is see if any of our laws in the future are challenged, what the facts of

The dissent mistakenly views laws already on the books as beyond the reach of Amendment 1A, and gets to that conclusion by erroneously redefining the "scope of the state constitutional right to keep and bear arms." The State does not make that specific argument. To the contrary, the assistant attorney general representing the state at oral argument this term in *State v. Mahana*, said, "I don't think this court gets to rubber-stamp the laws that the legislature passed." Rather, the State appropriately frames the issue in its appellate brief in today's case as whether Iowa Code "[s]ection 724.26(2)(a) survives strict scrutiny under Article I, Section 1A." And the brief by amicus curiae of Twenty-Nine Iowa State Senators likewise frames the issue as whether "Iowa Code § 724.26(2)(a) satisfies strict scrutiny" under Amendment 1A. The dissent goes well beyond the position of the parties here, contrary to the party-presentation rule. *See Iowa Ass'n of Bus. & Indus. v. City of Waterloo*, 961 N.W.2d 465, 480 (Iowa 2021) (McDonald, J., concurring in part and dissenting in part).

I also disagree with the dissent's view that "the people" protected by Amendment 1A are limited to law-abiding citizens. *See* Iowa Const. art. I, § 1A. As noted, Amendment 1A was enacted to preserve and strengthen the protections of the Second Amendment to the United States Constitution for Iowans. *In re N.S.*, 13 N.W.3d at 826–27. The Second Amendment, like Amendment 1A, includes the phrase, "the right of the people to keep and bear arms." *See* U.S. Const. amend. II. Federal appellate courts, while upholding firearm restrictions on other grounds, have expressly rejected arguments like the

---

that case bear—that's how we answer the question of whether or not a particular law is unconstitutional.

*Senate Video SRJ 7 by Whiting of Dickinson*, Iowa Legislature, at 12:05:55–12:06:25 PM (Jan. 28, 2021), https://www.legis.iowa.gov/dashboard?view=video&chamber=S&clip=s20210128090015250&dt=2021-01-28&offset=8506&bill=SJR%207&status=i&ga=89.

one the dissent makes today, that would limit "the people" who may keep and bear arms to only "law-abiding citizens" and not felons. *See, e.g.*, *United States v. Watson*, 171 F.4th 1012, 1017–18 (7th Cir. 2026) ("*Heller* tells us 'the people' 'unambiguously refers to all members of the political community, not an unspecified subset.' . . . Thus—without providing a conclusive definition—we can say the phrase 'the people' at least encompasses citizens, which includes felons." (quoting *Heller*, 554 U.S. at 580)); *United States v. Harrison*, 153 F.4th 998, 1014 (10th Cir. 2025) (rejecting the federal government's argument that the Second Amendment applies only to "law-abiding citizens" and stating that "[t]oday, we hold the 'people' for purposes of the Second Amendment include, at least, all Americans. With this holding, we join the weight of persuasive authority since *Rahimi*"); *Fla. Comm'r of Agric. v. Att'y Gen. of the U.S.*, 148 F.4th 1307, 1317–18 (11th Cir. 2025) ("[W]e reject the Federal Government's argument that Cooper and Hansell are not among 'the people' [protected by the Second Amendment] because they are not 'law-abiding' or 'responsible.' "); *Zherka v Bondi*, 140 F. 4th 68, 77 (2d Cir. 2025) ("We will neither jeopardize the scope of other [individual] rights nor demean the status of Second Amendment rights by narrowly circumscribing the classes of Americans to whom those rights belong. Accordingly, we conclude that Zherka, notwithstanding his felony conviction, is among 'the people' protected by the Second Amendment."); *United States v. Duarte*, 137 F.4th 743, 754–55 (9th Cir. 2025) (en banc) ("Duarte's status as a felon does not remove him from the ambit of the Second Amendment; he is one of 'the people' who enjoys Second Amendment rights."); *United States v. Diaz*, 116 F.4th 458, 466 (5th Cir. 2024) ("[A]ll people have the right to keep and bear arms . . . ." (alteration in original) (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by N.Y. State Rifle & Pistol Ass'n v.*

*Bruen*, 597 U.S. 1 (2022))); *United States v. Williams*, 113 F.4th 637, 649 (6th Cir. 2024) ("Williams is a member of the people claiming 'the right' to possess a gun . . . ."). And just this month, the United States Supreme Court reiterated, "The Second Amendment protects the right of 'all Americans' to keep and bear firearms for self-defense." *United States v. Hemani*, No. 24–1234, 608 U.S. ___, ___, 2026 WL 1751710, at *4 (June 18, 2026) (quoting *Heller*, 554 U.S. at 581). I would follow this persuasive body of precedent to hold that "the people" protected under Amendment 1A includes all Iowans.[2]

Our court today correctly applies strict scrutiny to Iowa Code section 724.26(2)(*a*) and determines that, as applied to Schadl, the statute violates his right to keep and bear arms under Amendment 1A. Nothing in the text of Amendment 1A exempts section 724.26(2)(*a*) from its purview merely because the statute was already on the books when the people of Iowa ratified Amendment 1A in 2022. This statute by its terms restricts Schadl's right to keep and bear arms; indeed, this statute disarms him for life. Under Amendment 1A, "[a]ny and all restrictions of this right shall be subject to strict scrutiny." Iowa Const. art. I, § 1A. Unlike the dissent that would place Iowa's firearm laws beyond the reach of Amendment 1A, the majority today correctly applies this constitutional amendment as written.

---

[2]The dissent relies on language in *Heller*, 554 U.S. at 635, *McDonald*, 561 U.S. at 780, and *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. at 8–9, describing the successful challengers to firearm restrictions in those cases as "law-abiding citizens." But the United States Supreme Court has never held that *only* law-abiding citizens enjoy a right to keep and bear arms under the Second Amendment.

**Mansfield, Justice (concurring).**

I join the majority opinion because I agree with the essential points in the majority's analysis. First, article I, section 1A of the Iowa Constitution, as approved and ratified by the citizens of Iowa in 2022, requires us to apply "strict scrutiny" to "[a]ny and all restrictions" of the right to bear arms. Second, in an as-applied challenge, the State has the burden of showing that disarming the defendant is narrowly tailored to further the compelling state interest in public safety. Third, the State cannot meet that burden in the district court merely by citing the fact that the defendant was convicted of domestic abuse assault fourteen years ago. And more particularly, the State cannot plug a hole in the district court record simply by citing social science articles to us on appeal—in effect asking us to determine on the basis of these articles that Iowa Code section 724.26(2)(*a*) (2024) is *per se constitutional under all circumstances.* Finally, I agree that the Governor's completely discretionary pardon power is not a safety valve that allows us to sustain an otherwise unconstitutional restriction in this case.

However, despite my overall agreement with the majority opinion, I worry that it doesn't provide enough guidance. Given today's ruling, citizens, judges, prosecutors, defense attorneys, and public officials may now wonder what they should do next. I offer a few suggestions.

**I. Restrictions on Firearms Possession Based on a Criminal Conviction or a Plea of Guilty Are Presumptively Constitutional for the Time Period During Which the Defendant Could Have Been Incarcerated for That Offense.**

It seems to me that the greater power to take away the defendant's *entire liberty* includes the lesser power to take away the defendant's right to keep and

bear arms. So if the defendant could have received a five-year prison sentence, and instead received a deferred judgment or probation, it is presumptively constitutional to restrict the defendant's right to keep and bear arms for five years.

**II. The Defendant May Waive the Right to Firearms Possession as Part of a Plea Agreement.**

We have already decided in *State v. Cole*, 23 N.W.3d 231, 241 (Iowa 2025), that the constitutional right to keep and bear arms may be waived. *See id.* ("[W]e hold that Cole waived his claims under the Second Amendment and article I, section 1A of the Iowa Constitution by consenting to the terms of the protective order . . . ."). Nothing in today's decision calls *Cole* into question. Thus, going forward, one option for the state may be to ask for a voluntary waiver of the right to keep and bear arms—for at least some period of time—as a condition of a plea agreement. Depending on the circumstances, the state may need additional statutory authority to do this.

**III. The Defendant's Ongoing Commission of Crimes Can Be a Justification for an Ongoing Restriction on Firearms Possession.**

There is no evidence that the defendant in this case has committed a criminal offense since his domestic abuse assault conviction in 2010. But in another case, disarming an individual could survive strict scrutiny if, following the predicate conviction, the individual committed additional crimes, especially crimes of violence or firearm-related crimes. In *State v. Woods*, 23 N.W.3d 258, 276–77 (Iowa 2025) (plurality opinion), *petition for cert. filed*, No. 25–5746 (U.S. Sep. 26, 2025), we decided that a defendant's conviction for carrying a dangerous weapon while in the possession of a controlled substance did not violate article I, section 1A. The plurality emphasized that "the state has a compelling interest in curbing the increased risk of death and physical injury associated with an

individual's possession of a firearm while simultaneously in the illegal possession of a controlled substance or while simultaneously committing an indictable offense." *Id.* at 276. The plurality added that "[t]he government also has a compelling interest in protecting the safety of peace officers, who are placed at increased risk of death and physical injury when investigating and responding to crimes committed when the suspect is in possession of a firearm." *Id.* (citation omitted). If it is important that individuals not possess firearms *when they are committing crimes*, it is logical to continue a ban on possession for individuals who continue to commit crimes.

**IV. A Regularized Path for Restoration of the Convicted Defendant's Right to Keep and Bear Arms May Pass Strict Scrutiny.**

Today's decision leads to an unwieldy situation. To prove a violation of Iowa Code section 724.26(2)(*a*), the state now has to prove *two* cases: (1) that the defendant committed the offense, which will have to be proved to a jury; and (2) that it's constitutional to prosecute the defendant for committing the offense, which will have to be proved to the court.

Moreover, short of bringing a civil action for declaratory or injunctive relief, the defendant is in a quandary. In Iowa, there is no established judicial or administrative path by which an individual with a prior criminal conviction may seek restoration of the right to keep and bear arms.

Notably, we previously sustained section 724.31—which enables persons with prior mental health commitments to obtain restoration of firearms rights under limited circumstances—against an article I, section 1A challenge. *In re N.S.*, 13 N.W.3d 811, 816 (Iowa 2024) (finding that section 724.31 survives strict scrutiny under article I, section 1A). In an appropriate case, we might determine that a legislatively enacted path for restoring convicted felons' firearms rights

passes muster under article I, section 1A. Such a procedure would enable the state to avoid satellite litigation like this.

**V. It May Make Sense to Consider the Second Amendment Challenge First.**

This brings me to a final point. Although the majority opinion does not address the defendant's Second Amendment challenge to his conviction, the federal dimensions of this case loom large. If it does not violate the Second Amendment to disarm the defendant, then his possession of the .22 caliber rifle was a prosecutable crime *under federal law*. *See* 18 U.S.C. § 922(g)(9). In that event, the defendant had no legal right to possess firearms. Iowa Code section 724.26(2)(*a*) would be essentially just an *enhancement*—an additional criminal sanction for conduct that the defendant could not engage in anyway. *See Woods*, 23 N.W.3d at 277 (discussing a Louisiana Supreme Court case which used that characterization for the crime of possessing a firearm while possessing illegal drugs). The State's burden to overcome strict scrutiny would, seemingly, be less, since the State wouldn't be prohibiting an act that the defendant had a right to engage in; it would simply be adding a punishment for indisputably illegal conduct.

On the other hand, if Iowa Code section 724.26(2)(*a*) also violated the Second Amendment as applied to the defendant, then it would become unnecessary to consider article I, section 1A at all.

I recognize that we can choose whether to consider federal constitutional arguments or state constitutional arguments, but it may make sense to give primacy to the federal constitutional arguments. That is because federal law provides both rights and restrictions, and both those rights and those restrictions supersede contrary state law. *See State v. Kieffer*, 17 N.W.3d 651,

664 (Iowa 2025) (discussing Second Amendment challenges in the federal courts to 18 U.S.C. § 922(g)(9)).

The majority has chosen not to go in that direction, and I am joining the opinion because I believe it is analytically correct. But in the future, and particularly if we receive more guidance from the United States Supreme Court, it may be more appropriate to consider the Second Amendment challenge first.

With these comments, I join the majority opinion, including its determination that Eric Schadl's conviction for violating Iowa Code section 724.26(2)(*a*) should be reversed.

Waterman, J., joins this concurrence.

**McDonald, Justice (dissenting).**

Iowa Constitution article I, section 1A was adopted in 2022. It provides: "The right of the people to keep and bear arms shall not be infringed. The sovereign state of Iowa affirms and recognizes this right to be a fundamental individual right. Any and all restrictions of this right shall be subject to strict scrutiny." *Id.* I appreciate the majority's efforts to interpret and apply this new constitutional provision, which is particularly difficult due to the United States Supreme Court's recent doctrinal shift in interpreting and applying the parallel provision in the Second Amendment to the United States Constitution. That being said, I must respectfully dissent. In interpreting and applying article I, section 1A, the majority departs from this court's controlling methods of constitutional adjudication, rejects recent holdings and statements from this court regarding the scope and operation of article I, section 1A, and fails to exercise the appropriate level of caution and prudence in interpreting and applying this new law.

The majority departs from well-established rules of state constitutional interpretation and adjudication. As a general matter, this court determines the constitutional limitations imposed on government action by determining the original law established by the constitutional provision at issue in light of the body of law in place at the time the constitutional provision was adopted.[3] Just

---

[3] *See State v. Lindaman*, 30 N.W.3d 547, 559 (Iowa 2025) ("The original, fundamental law of the constitution as ratified by the people remains the law until amended."); *id.* at 578 (Waterman, J., dissenting) (examining the framers' intent to determine the original meaning of the state constitutional right to confrontation); *Sikora v. State*, 23 N.W.3d 300, 346 (Iowa 2025) (McDermott, J., dissenting) (explaining that the "background law at the time of the framing . . . was incorporated into our constitution"); *Singer v. City of Orange City*, 15 N.W.3d 70, 75 (Iowa 2024) ("We also recognize our duty to 'interpret our constitution consistent with the text given to us by our founders,' and to 'give the words used by the framers their natural and commonly-understood meaning' in light of the 'circumstances at the time of adoption.' " (quoting

two years ago, a majority of this court applied that rule to article I, section 1A and stated that we apply "Amendment 1A as publicly understood at the time of its enactment in 2022." *In re N.S.*, 13 N.W.3d 811, 826 (Iowa 2024) (Waterman, J., joined by Christensen, C.J.) (plurality opinion); *see also id.* at 837 (McDonald, J., concurring in part and concurring in the judgment, joined by Oxley, J.). Today, a different majority of the court departs from this accepted method of constitutional interpretation and adjudication, generally, and departs from what a majority of this court said in *In re N.S.*, specifically.

I disagree with the majority's selective application of our accepted methods of constitutional interpretation and adjudication to reach a particular result. *See*

---

*State v. Burns*, 988 N.W.2d 352, 360 (Iowa 2023))); *State v. White*, 9 N.W.3d 1, 7 (Iowa 2024) ("At the time when our constitution was adopted, a 'confrontation' was understood to involve a 'face to face' encounter." (quoting *Dictionary of the English Language* 85 (abr. rev. ed. 1856))); *State v. Bauler*, 8 N.W.3d 892, 926 (Iowa 2024) (McDermott, J., dissenting) ("A modern-day action violates a reasonable expectation of privacy—and is thus unconstitutional—if a founding-era equivalent action would have violated the Constitution."); *Burnett v. Smith*, 990 N.W.2d 289, 294–97 (Iowa 2023) (discussing the framers' understanding of sovereign immunity and damages actions); *Burns*, 988 N.W.2d at 398 (McDermott, J., dissenting) (discussing the original meaning of the Fourth Amendment based on caselaw " 'undoubtedly familiar' to 'every American statesman' at the time the Constitution was adopted" (quoting *United States v. Jones*, 565 U.S. 400, 405 (2012))); *Howsare v. Iowa Dist. Ct.*, 986 N.W.2d 114, 117 (Iowa 2023) (discussing the "history leading up to our founding" to determine the scope of the constitutional right to bail); *State v. Basquin*, 970 N.W.2d 643, 657 (Iowa 2022) (explaining that to determine whether a branch exercised forbidden powers, "we first look to the words used by our framers to ascertain intent and the meaning of our constitution" (quoting *State v. Thompson*, 954 N.W.2d 402, 410 (Iowa 2021))); *State v. Brown*, 930 N.W.2d 840, 846 (Iowa 2019) (determining the original meaning of state constitutional search and seizure protections by examining the "1857 debates over the Iowa Constitution"); *Baldwin v. City of Estherville*, 915 N.W.2d 259, 276 (Iowa 2018) (answering a qualified immunity question based on the law "at the time our Constitution was adopted"); *Planned Parenthood of the Heartland v. Reynolds ex rel. State*, 915 N.W.2d 206, 247 (Iowa 2018) (Mansfield, J., dissenting) (beginning constitutional analysis with the text and original understanding), *overruled by Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, 975 N.W.2d 710 (Iowa 2022); *State v. Crooks*, 911 N.W.2d 153, 167 (Iowa 2018) ("In exercising our independent judgment, we are 'guided by "the standards elaborated by controlling precedents and by [our] own understanding and interpretation of the [Iowa Constitution's] text, history, meaning, and purpose." ' " (alterations in original) (quoting *State v. Lyle*, 854 N.W.2d 378, 386 (Iowa 2014))); *Chiodo v. Sec. 43.24 Panel*, 846 N.W.2d 845, 851 (Iowa 2014) ("We seek to interpret our constitution consistent with the object sought to be obtained at the time of adoption as disclosed by the circumstances."); *Des Moines Joint Stock Land Bank of Des Moines v. Nordholm*, 253 N.W. 701, 726 (Iowa 1934) ("We are committed to the rule that flight of time and change in conditions do not alter the meaning of such provisions of the Constitution from that intended and understood by those who framed and adopted the Constitution.").

Richard H. Fallon, Jr., *Selective Originalism and Judicial Role Morality*, 102 Tex. L. Rev. 221, 244–45 (2023) ("Selective originalism is a practice of constitutional decisionmaking in which putatively originalist [judges] sometimes ignore or subordinate their avowed originalist premises, . . . and instead rest their decisions on prior judicial precedents based partly on their policy-based preferences without regard to whether those precedents . . . are defensible on originalist grounds . . . ."). If the law established by a constitutional provision adopted in 1857 is determined in light of the body of law in place in 1857, and this court says it is, then the law established by a constitutional provision adopted in 2022 should be determined in light of the body of law in place in 2022, as we previously said it was.

The body of law in place at the time article I, section 1A was adopted in 2022 shows that prohibiting convicted domestic abusers from possessing firearms does not implicate the state constitutional right to keep and bear arms because the nature and scope of the state constitutional right to keep and bear arms does not extend to convicted domestic abusers. In 2022, federal law prohibited it. *See* 18 U.S.C. § 922(g)(9). The Iowa Code has excluded domestic violence misdemeanants from the category of people entitled to possess firearms since 2010. 2010 Iowa Acts ch. 1083, § 4 (codified at Iowa Code § 724.26(2)(*a*) (2011)). Iowa law reflected the predominant approach among the states on this issue. *See* Ala. Code § 13A-11-72(a) (2022); Ariz. Rev. Stat. Ann. §§ 13-3101(A)(7)(d), -3102(A)(4) (2022); Cal. Penal Code §§ 29805(a)–(b), 29810 (West 2022); Colo. Rev. Stat. §§ 18-12-108(6)(c), -6-801(8) (2022); Conn. Gen. Stat. 46b-38a; *id.* § 53a-217c (2022); Del. Code Ann. tit. 10, § 1041(2) (2022); *id.* tit. 11, § 1448(a)(7), (d); D.C. Code § 22-4503(a)(6) (2022); Haw. Rev. Stat. § 134-7(a)–(b), (f), (h) (2022); 430 Ill. Comp. Stat. 65/4(a)(2)(ix), /8(l) (2022); 720 *id.*

5/12-3.2 to -3.3; 725 *id.* 5/112A-3(b); Ind. Code §§ 35-31.5-2-128, -42-2-1.3, -47-4-6 (2022); Kan. Stat. Ann. § 21-6301(a)(18), (m)(1) (2021); La. Stat. Ann. § 14:95.10 (2022); Me. Stat. tit. 15, § 393(1-B) (2022); Md. Code Ann., Pub. Safety §§ 5-101(b-1), (g), -133(b)(1), -205(b)(1) (West 2022); Mass. Gen. Laws ch. 140, § 129B(1)(ii)(F) (2022); Minn. Stat. § 518B.01(2) (2022); *id.* § 609.2242(3)(c)–(d); Neb. Rev. Stat. § 28-1206(1)(b) (2022); Nev. Rev. Stat. § 33.018 (2022); *id.* § 202.360(1)(a); N.J. Rev. Stat. § 2C:25-19(d) (2022); *id.* § 2C:39-7(b)(2); N.M. Stat. Ann. §§ 30-3-11(A), -7-16(A)(3) (2021); N.Y. Penal Law §§ 265.00(17)(b), .01(4) (McKinney 2022); *id.* § 400.00(1)(c); Or. Rev. Stat. § 135.230(3)–(4) (2021); *id.* § 166.255(1)(b)(A), (3)(c); 18 Pa. Cons. Stat. § 6105(c)(9) (2022); 11 R.I. Gen. Laws § 11-47-5(a)(4) (2022); 12 *id.* §§ 12-29-2(a)–(b), -5(d), (g)–(h); S.C. Code Ann. § 16-25-30(A) (2022); S.D. Codified Laws § 22-14-15.2 (2022); Tenn. Code Ann. § 39-17-1307(f)(1)(A) (2021); Tex. Penal Code Ann. § 46.04(b) (West 2022); Tex. Fam. Code Ann. §§ 71.003–.006, .0021 (West 2022); Utah Code Ann. § 76-10-503(1)(b)(x)–(xi), (d), (3) (West 2022); Vt. Stat. Ann. tit. 13, § 4017(a), (d)(3); *id.* § 5301(7)(C) (2022); Va. Code Ann. § 18.2-308.1:8 (2022); Wash. Rev. Code § 7.105.010(20) (2022); *id.* §§ 9.41.010(8), .040(2)(a)(i); W. Va. Code § 61-7-7(a)(8) (2022).

Of course, this is not to say that every law related to firearms in the Code as of 2022 will survive constitutional challenge. It is only to say that before this court applies strict scrutiny to a law related to firearms, it must, pursuant to article I, section 1A, determine the nature and scope of the right to keep and bear arms and determine what constitutes a restriction of this right. Recall that article I, section 1A only requires the application of strict scrutiny to laws that restrict the right to keep and bear arms. Thus, the determination of the nature and scope of the right and what constitutes a restriction on that right are both

necessary prerequisite determinations prior to the application of strict scrutiny. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 230 (1995) (explaining that once it has been determined that a constitutional right has been infringed, then "[t]he application of strict scrutiny, in turn, determines whether a compelling governmental interest justifies the infliction of that injury"); *State in re J.M.*, 144 So. 3d 853, 859–60 (La. 2014) ("Before we address the constitutionality of the statutes at issue, we must discuss the nature of the state constitutional right to keep and bear arms. . . . The voters of Louisiana did not ratify this constitutional amendment in a vacuum. In our opinion, the reference to restrictions on the right to keep and bear arms in the proposition reflects an expectation of sensible firearm regulation held by the voters, and comports with historical restrictions with respect to the acquisition, possession or use of firearms for lawful purposes found in Louisiana law."); Todd E. Pettys, *The N.R.A.'s Strict-Scrutiny Amendments*, 104 Iowa L. Rev. 1455, 1481 (2019) [hereinafter Pettys] (stating that courts should "consider, as a threshold matter, whether the facts in a given claimant's case bring the fundamental right to keep and bear arms into play" and that "states with strict-scrutiny amendments have largely failed to give this gateway question its due, resulting in occasionally problematic rulings"). The body of law in place as of 2022 is relevant, although not dispositive, to both of those determinations.

The majority and Justice Waterman's concurrence fail to engage with this relevant body of law. This is understandable. As discussed above, the relevant law cuts against their position. By way of additional example, Justice Waterman argues that this court should look to federal courts applying the Second Amendment for the proposition that the right to keep and bear arms is not limited to law-abiding citizens but also includes convicted criminals. What the

concurrence fails to note is that the federal courts that have considered federal constitutional challenges to 18 U.S.C. § 922(g)(9)—the prohibition incorporated into and serving as the predicate for prosecution under Iowa Code section 724.26(2)(*a*) (2024)—have uniformly upheld it.[4] As Chief Justice Christensen explained last term, the conclusion that Iowa Code section 724.26(2)(*a*) violates the right to keep and bear arms "is not in line with current federal law." *State v. Cole*, 23 N.W.3d 231, 244 (Iowa 2025) (Christensen, C.J., concurring). She correctly explained that federal courts have consistently concluded that disarming convicted domestic violence misdemeanants is consistent with the right to keep and bear arms. *Id.*; *see also United States v. Hemani*, 608 U.S. ___, ___, 2026 WL 1751710, at *10 n.6 (June 18, 2026) ("Likewise, our conclusion today should not be taken to suggest 'that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse.'" (quoting *United States v. Rahimi*, 602 U.S. 680, 698 (2024))). Indeed, the Supreme Court just explained that its caselaw should not be taken to cast doubt on certain categorical bans. *Id.* (approving disarming convicted felons and persons adjudicated as mentally defective).

The majority and concurrence's failure to engage with this relevant body of law leads to an absurd result. "To amend the Iowa Constitution, the legislature

---

[4]The analysis under the Second Amendment is different than under article I, section 1A. The Supreme Court has instructed that Second Amendment challenges are resolved by looking at the text and law in place at the time the constitutional provision was enacted to find historical analogues that provide guidance regarding the permissible restrictions of the federal right to keep and bear arms. *See United States v. Rahimi*, 602 U.S. 680, 692 (2024); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 26 (2022). Under article I, section 1A, courts are to look at the text and law in place at the time the state constitutional provision was enacted to determine the nature and scope of the right. While the analyses are conceptually distinct, the thrust of the inquiries are the same: courts are to look at the body of law in place at the time the constitutional provisions were adopted to determine the original law established by the constitutional provision and thus the scope of the constitutional limitations imposed on future lawmakers.

must approve identical language in two separate general assemblies with an intervening general election, followed by ratification by a majority of Iowa voters." *N.S.*, 13 N.W.3d at 826. This court must "presume that the general assembly, in twice approving the amendment before submitting it to the people for a referendum, did not intend the amendment to overturn the numerous laws on the books" restricting who could possess firearms. *State v. Woods*, 23 N.W.3d 258, 275 (Iowa 2025) (plurality opinion), *petition for cert. filed*, No. 25–5746 (U.S. Sep. 26, 2025). As Justice Waterman, joined by Chief Justice Christensen, explained two years ago: "If the same Iowa legislators who approved Amendment 1A saw section [724.26(2)(*a*)] 'as part of the problem they were aiming to solve, [we] might well ask, why didn't they repeal the legislation, rather than launch the cumbersome amendment process and leave the objectionable law's fate to the vagaries of future litigation?' " *N.S.*, 13 N.W.3d at 835 (Waterman, J., joined by Christensen, C.J.) (second alteration in original) (quoting Pettys, 104 Iowa L. Rev. at 1471). The reason the legislature did not repeal the legislation is that the legislature understood the preexisting nature and scope of the right and further understood that laws prohibiting convicted domestic abusers from possessing firearms were not within the scope of the right. "It would be absurd to suggest the legislature intended to approve a constitutional amendment that *struck down its own law.*" *Chiodo v. Sec. 43.24 Panel*, 846 N.W.2d 845, 862 (Iowa 2014) (Mansfield, J., specially concurring). But that is exactly what my colleagues conclude today.[5]

---

[5]The State argued that the prevention of gun violence against women was a compelling interest and that this law was narrowly tailored to achieve that interest. I agree with the State's position. The majority rejects that position. Part of the basis of the majority opinion seems to be a belief that a showing of dangerousness is the only justification that can support prosecution for a firearms offense. In addition to today's opinion, see *State v. Woods*, 23 N.W.3d at 287 (McDermott, J., dissenting, joined by Waterman and May, JJ.) ("Although we accept a legislature's power to restrict the right to bear arms when it's imposed against people who are

The majority's deviation from this court's accepted method of adjudicating constitutional claims to reach an absurd result is inconsistent with the judicial role. This court is a coordinate department of the government engaged in governance for the common good, which requires the exercise of discretion and prudence in addressing the practical problems of governance. "While it is an imperative duty, from which no court will shrink, to declare void any statute the unconstitutionality of which is made apparent, . . . this prerogative [must] be exercised with the greatest caution . . . ." *McGuire v. Chi., B. & Q. R. Co.*, 108 N.W. 902, 905 (Iowa 1906). We exercise caution in constitutional matters due to

---

dangerous, in this case, the plurality upholds a firearm restriction even though the element of danger is absent.").

That belief appears to arise out of misunderstanding of the Supreme Court's decision in *United States v. Rahimi*, 602 U.S. 680. To the extent *Rahimi* has any bearing on the state constitutional right, "*Rahimi* did not sweepingly proclaim that 'dangerousness' is the new standard for Second Amendment challenges." *United States v. Mitchell*, 160 F.4th 169, 187 (5th Cir. 2025), *petition for cert. filed*, No. 25–935 (U.S. Feb. 06, 2026). *Rahimi* concluded that a showing of dangerousness was sufficient to justify prosecution of a person for illegal possession of a firearm under 18 U.S.C. § 922(g)(8), not that it was a necessary showing. *Mitchell*, 160 F.4th at 187. Justice Gorsuch, concurring, explained that the Court did not "decide . . . whether the government may disarm a person without a judicial finding that he poses a 'credible threat' to another's physical safety." *Rahimi*, 602 U.S. at 713 (Gorsuch, J., concurring). "*Rahimi* did not attempt to swap or displace *Bruen*'s text, history, and tradition methodology with a new, amorphous standard of dangerousness for Second Amendment challenges." *Mitchell*, 160 F.4th at 187.

To the extent the majority believes that only a showing of dangerousness can justify the loss of the state constitutional right to keep and bear arms, as the majority understands the right, its belief is wholly inconsistent with other aspects of constitutional and criminal law. Consider the following. Ongoing criminal conduct involves nonviolent financial crimes such as forging checks or engaging in home repair scams. *See* Iowa Code ch. 706A (2024) (defining and criminalizing ongoing criminal conduct); *State v. Olsen*, 618 N.W.2d 346, 347 (Iowa 2000) (en banc) (affirming an ongoing criminal conduct conviction based on a nonviolent home repair scam). A violation of the statute is a class "B" felony subjecting a person to an indeterminate period of incarceration not to exceed twenty-five years. *See* Iowa Code § 706A.4; *id.* § 902.9(1)(*b*). So, if the majority is right, the state can lawfully imprison a nonviolent offender for twenty-five years, deprive the offender of the fundamental right of liberty, and deprive the offender of the fundamental right to possess firearms, but the state, if the offender is at liberty, cannot prohibit that person from possessing a firearm because there is no showing of dangerousness. That cannot be right. The greater power to incarcerate an offender, which can be employed without a showing of dangerousness, includes the lesser power of disarmament. If the state can lawfully imprison a nonviolent offender for twenty-five years, I am not sure why the state cannot simply add an additional punishment for any criminal conviction that prohibits any offender, including a nonviolent offender, from possessing a firearm permanently or for some fixed duration.

our "respect for the other two branches of government." *Iowa Citizens for Cmty. Improvement v. State,* 962 N.W.2d 780, 791 (Iowa 2021) (quoting *Godfrey v. State,* 752 N.W.2d 413, 425 (Iowa 2008)).

The majority's decision is neither cautious nor respectful. It is not cautious because the majority could avoid declaring the statute unconstitutional by adhering to our established rules of constitutional interpretation and adjudication. It is not respectful because it assumes the worst of other government officials, contrary to our law. In discharging our constitutional duty, this court presumes the legislature knows the law and that it acts in good faith to conform its legislation to the dictates of the constitution. But the majority presumes the opposite. For the majority's rationale and result to hold together, the majority must assume one or both of the following to be true: the members of the general assembly are ignorant and did not understand the legal implications of the amendment they twice approved and sent to the people for consideration; or the members of the general assembly are feckless and knew that many of its laws would be held unconstitutional by this court, but they lacked the conviction to repeal those laws on their own.

I cannot indulge either of these presumptions, and the court should not either. One, because it is inconsistent with our rules of constitutional adjudication. Two, because members of the legislature have weighed in on the issue. Pursuant to Iowa Code section 625A.19 (2025), twenty-nine state senators filed an amicus brief in this case. They argued that they understood the state of the law and that the amendment was not intended to destroy the Code section by section. Specifically, they explained that the legislature made a determination that the law at issue in this case was not in violation of article I, section 1A.

In response, the majority claims it is not presuming the legislature to be ignorant of the law or feckless, but I do not understand the majority's explanation. According to the majority, strict scrutiny "is a wholly judicial construct developed by courts, for courts." The majority continues, explaining that "no other branch, including the legislature, applies a strict scrutiny test." Unless I am missing something, isn't this just another way of stating the legislature was and is ignorant of the legal ramifications of the amendment it approved? In any event, the majority's explanation is nonresponsive. My only point is that it is absurd to think the legislature intended that the constitutional amendment it twice passed and submitted to the voters would preclude the enforcement of long-standing and widely accepted criminal firearms laws.

In further response, the majority then quickly turns to the voters' understanding of article I, section 1A. This is a non sequitur. The voters' understanding of article I, section 1A has nothing to do with the presumptions of good faith we afford the legislature. Even in resolving this non sequitur, however, the majority's analysis fails on its own terms. The majority rejects the argument that the voters did not intend to invalidate existing law because "the record contains no evidence of voters' knowledge about existing firearm restrictions when they voted for Amendment 1A." But this court has never required a party to put evidence in the record regarding the public's understanding of the law. Rather, the people, like legislators, are presumed to know the law. As the cases cited in the first footnote of this opinion show, this court determines the original public meaning of a constitutional provision based on an examination of the law existing at the time the constitutional amendment was adopted and not based on record evidence showing the public's subjective understanding of the law.

As indicated above, when one looks at the law in place at the time the people approved article I, section 1A, it is clear that the state constitutional right to keep and bear arms did not encompass the right of domestic violence misdemeanants to possess firearms. In addition to the federal statutory prohibition, the Iowa statutory prohibition, and the statutory prohibitions in other states, at the time article I, section 1A was submitted to the voters, the Supreme Court had recently issued a series of landmark opinions recognizing and clarifying the nature and scope of the right to keep and bear arms under the Second Amendment. In *District of Columbia v. Heller*, the Supreme Court held that an ordinance prohibiting the possession of usable handguns in the home violated the right to keep and bear arms, assuming that the person was "not disqualified from the exercise" of the right. 554 U.S. 570, 635 (2008). In *McDonald v. City of Chicago*, the Court held that the federal constitutional right to keep and bear arms applied to the states and held that two city ordinances similar to the one at issue in *Heller* were unconstitutional. 561 U.S. 742, 780 (2010). In *New York State Rifle & Pistol Ass'n v. Bruen*, the Court concluded that "ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense." 597 U.S. 1, 9 (2022). The Court further held that a New York law that conditioned the "issuance of a license to carry on a citizen's showing of some additional special need" violated the right to keep and bear arms. *Id.* at 11. It is noteworthy that *Bruen* was issued in June of 2022, only several months before the voters approved the state constitutional amendment.

To the extent the voters had an understanding of the right to keep and bear arms, it was coextensive with the Supreme Court's formulation of the right as one belonging to law-abiding citizens as expressed in *Heller*, *McDonald*, and culminating in *Bruen*. In each of these significant decisions, the Supreme Court

made clear that the right to keep and bear arms was a right of law-abiding citizens. *See id.* at 8–9 ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun . . . ."); *id.* at 9–10, ("In this case, petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. We too agree . . . ."); *id.* at 26 (stating that the Second Amendment " 'elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense" (quoting *Heller*, 554 U.S. at 635)); *id.* at 31–32 ("It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects."); *id.* at 38 (discussing the lack of historical tradition regarding limitations on public carry for "law-abiding citizens"); *id.* at 59–60 (discussing the lack of historical limitations on "law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose"); *id.* at 70 (noting that "law-abiding, responsible citizens" historically have not had to demonstrate a special need to carry arms for self-protection); *id.* at 71 ("New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."); *McDonald*, 561 U.S. at 780 ("[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes . . . ."); *Heller*, 554 U.S. at 625, 635.

In short, in 2022, federal law, Iowa law, and the law of the majority of the states all converged on a single conclusion: when the citizens of this state ratified an amendment protecting the right to keep and bear arms, they ratified a right that protected the right of law-abiding citizens to keep and bear arms free from prohibitions and burdensome regulations rather than creating a constitutional right for convicted criminals, including domestic abusers, to possess firearms.

The majority points to no evidence or law that would support a contrary understanding as of 2022.

Lacking any evidence or law to support a contrary conclusion, the majority argues that it is "conceivable" that the public thought the right to keep and bear arms included the right of convicted domestic abusers to possess firearms and that the public "preferred instead to do away with all existing restrictions that violated the new amendment without a laborious statute-by-statute repeal." As the majority conceives things, the legislature understood that many of its laws were unconstitutional. The legislature, rather than going through the "laborious" process of legislating and repealing statutes it believed to be unconstitutional, instead went through the more laborious process of proposing an amendment to the state constitution. And, as the majority conceives things, the people, rather than using the "laborious" process of asking their legislators to legislate and repeal these unconstitutional laws, voted to approve article I, section 1A so that the people of this state could go through the even more laborious, more expensive, and never-ending process of adjudicating on a case-by-case basis the constitutionality of prosecuting each defendant in this state charged with any firearms offense. That's implausible. Justice Waterman, joined by Chief Justice Christensen, already rejected that argument two years ago. *See N.S.*, 13 N.W.3d at 835 (Waterman, J., joined by Christensen, C.J.). I agree with their previous conclusion.

For these reasons, I would affirm the defendant's conviction. I respectfully dissent.

Oxley, J., joins this dissent.